**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FitLab, Inc.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11681 (KBO)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFIYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, (V) GRANTING ADEQUATE PROTECTION, AND (VI) GRANTING RELATED RELIEF**

FitLab, Inc., and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby move for entry of interim and final orders granting the relief described below. In support of this motion (the "Motion"), the Debtors rely on the *Declaration of Nicholas Rubin as Chief Restructuring Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[2] and respectfully represent as follows:

1 The Debtors in these chapter 11 cases and the last four digits of their tax identification numbers are: (1) FitLab, Inc. (0335); (2) FL Events LLC (4931); (3) FL Studios LLC (0684); (4) FL Studio Partners LLC (3332); (5) FL Victory LLC (4966); (6) FL Digital LLC (3337); (7) FL Xtreme LLC (0335); (8) XPT Life LLC (6716); (9) Ragnar Holdings LLC (3664); (10) Ragnar Events LLC (5737); (11) Sauma, LLC (NA); (12) Yoga Vida LLC (5646); (13) Electric Visual Evolution LLC (7533); (14) Novo Fitness Inc. (7187); (15) RPM Fitness Inc. (8361); (16) LifeCore Fitness, LLC (6993); (17) Y7 Holdings LLC (4768); (18) Y7 Studios LLC (7905); (19) Y7 Management LLC (4875); (20) Mile High Run Club, LLC (6820); (21) Mile High Run Club Studio 2, LLC (0491); (22) MHRC UES LLC (5344); (23) MHRC Management Inc. (4271); (24) FitLab Fund Management LLC (8971); (25) FitLab Fund Founders LLC (9620); (26) FitLab Fund I, L.P. (1829); (27) Weight X, Inc. (NA); (28) FL Merch LLC (NA); (29) FitLab, LLC (0535); (30) FitLab Fund General Partner, LLC (0392); (31) Ragnar RTB, LLC (1963). The Debtors' mailing address is c/o Force 10 Partners, 5271 California Avenue, Suite 270, Irvine, CA 92617.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## PRELIMINARY STATEMENT

1. The Debtors commenced these Chapter 11 Cases to preserve and maximize the value of their estates through a comprehensive marketing and sale process and, if asset-sale proceeds and litigation recoveries permit, a chapter 11 plan providing meaningful recoveries for creditors. The Debtors have engaged Hilco Corporate Services, LLC to lead their sale efforts and intend to pursue claims against the MCA Funders and potentially other parties. Instrumental to this strategy is postpetition financing to address the Debtors' liquidity needs, including payments to employees, third-party vendors, landlords, taxing authorities, and insurance companies necessary to operate their businesses and maintain and insure their assets. As such, the Debtors seek authority to obtain new funding and use cash collateral pursuant to the DIP Term Sheet[3] attached hereto as **Exhibit "A"** and DIP Facility (as defined below); the proposed interim order attached hereto as **Exhibit "B"** (the "Interim Order"); and the proposed final order attached hereto as **Exhibit "C"** (the "Final Order" and, together with the Interim Order, the "DIP Orders"). The DIP Facility is a new-money, superpriority senior secured, priming, delayed-draw term loan facility in a maximum aggregate principal amount of $5,639,250, consisting of $5,150,000 for the FitLabs Borrowers and $489,250 for the Ragnar Borrowers. Upon entry of the Interim Order and satisfaction or waiver of applicable closing conditions, $2,150,000 shall be immediately funded for the FitLabs Borrowers and up to $350,000 shall be available for the Ragnar Borrowers in accordance with the Approved Budget and draw procedures. The remaining respective commitments shall be available following entry of the Final Order, subject to applicable conditions. The two facilities have separate obligations and collateral, without cross-group guarantees or cross-defaults solely by reason of an event affecting the other group. Immediate access to the DIP Facility and use of cash collateral are

[3] Any final credit agreement shall be consistent with the DIP Term Sheet; no implementing document may enlarge obligations or diminish protections without the affected parties' agreement and required Court approval.

necessary to fund operations and the costs of these Chapter 11 Cases and avoid immediate and irreparable harm. The DIP Facility constitutes a sound exercise of the Debtors' business judgment and will enable the Debtors to preserve and maximize value for their estates. The Debtors respectfully request that the Court grant the relief requested.

## JURISDICTION AND VENUE

2. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362, 363, 364, and 503(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

## RELIEF REQUESTED

5. By this Motion, the Debtors seek entry of the Interim Order and a Final Order (collectively, the "Orders"):

- authorizing the Debtors, as borrowers (the "Borrowers" or "DIP Loan Parties"), to obtain postpetition financing pursuant to a new-money, superpriority senior secured, priming, delayed-draw term loan facility (the "DIP Facility"), subject

to the DIP Orders and that certain DIP Financing Term Sheet dated November 3, 2026 (the "DIP Term Sheet"), among the Borrowers, Grizzly Investment Group, LLC or an affiliate thereof (the "FitLabs DIP Lender"), and Golazo NV, a Belgian naamloze vennootschap, or an affiliate thereof (the "Ragnar DIP Lender" and, together with the FitLabs DIP Lender, the "DIP Lenders"). Grizzly Investment Group, LLC is an entity formed by Rod Trujillo, a member of certain Debtors' boards and an insider of the Debtors. The facility consists of new-money loans (the "DIP Loans") of up to $5,639,250: $5,150,000 from the FitLabs DIP Lender to the Borrowers other than Ragnar Events LLC, Ragnar Holdings LLC and Ragnar RTB, LLC (the "FitLabs Borrowers"), and $489,250 from the Ragnar DIP Lender to those three Ragnar entities (the "Ragnar Borrowers"). Interim availability consists of a $2,150,000 FitLabs initial advance and up to $350,000 of Ragnar advances; remaining respective commitments become available after the Final Order, subject to applicable closing conditions. Each lender's commitment is several, not joint, and each group is liable only for its own DIP Obligations, secured only by its own Collateral;

- authorizing the DIP Loan Parties to execute, deliver and perform the DIP Term Sheet, any final credit agreement consistent therewith (the "DIP Credit Agreement"), and the DIP Orders (collectively, the "DIP Documents"); no implementing document shall enlarge any party's obligations or diminish its protections without its agreement and required Court approval;

- authorizing each borrower group to incur its respective outstanding principal actually advanced, together with accrued interest and fees and expenses properly payable under the DIP Documents (the "DIP Obligations," consisting respectively of "FitLabs DIP Obligations" and "Ragnar DIP Obligations"); undrawn commitments do not constitute outstanding principal, and no cross-group liability, guarantee or superpriority claim is created;

- subject to the Carve-Out and solely as authorized by the DIP Orders, granting each DIP Lender allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code against only its applicable Borrowers;

- granting each DIP Lender valid, enforceable and perfected liens under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code solely on its applicable DIP Collateral, only to the extent and with the priority expressly authorized in the DIP Orders, subject to the Carve-Out, preserved valid prior liens, applicable adequate protection and the Term Sheet's collateral exclusions;

- authorizing the DIP Lenders to take all commercially reasonable actions to implement the terms of the Interim Order;

- requesting, only upon entry of the Final Order and to the extent expressly approved by the Court, waivers of surcharge under section 506(c) and the

"equities of the case" exception under section 552(b) of the Bankruptcy Code; these waivers are not expressly provided in the DIP Term Sheet and remain subject to confirmation, agreement and Court approval;

- requesting, only upon entry of the Final Order and to the extent expressly approved by the Court, a waiver of marshaling, subject to the Carve-Out; this waiver is not expressly provided in the DIP Term Sheet and remains subject to confirmation, agreement and Court approval;

- authorizing the Borrowers to use their respective DIP proceeds in accordance with the DIP Documents and the Approved Budget (also referred to herein as the "Budget"), including the Permitted Variance and Professional Fee Tolerance, with no cross-group funding of the other DIP Lender's fees or expenses;

- authorizing the Debtors, subject to the DIP Orders, to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code, including petition-date cash and postpetition proceeds in which prepetition secured parties assert interests ("Cash Collateral"), subject to identification of affected parties, their collateral interests and consent status, and Court approval of required adequate protection, without admission of disputed claims or liens;

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors and the DIP Lenders to implement and effectuate the terms and provisions of the Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order, and, upon entry, the Final Order; and

- scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility on the terms of the Final Order.

**Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**

6. The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| **Summary of Material Terms**[4] | |
|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors listed in footnote 1 are the Borrowers. Ragnar Events LLC, Ragnar Holdings LLC and Ragnar RTB, LLC are the Ragnar Borrowers; all remaining Borrowers are the FitLabs Borrowers. Each group is liable only for its own facility, with no cross-group guarantee or collateral support. Nicholas Rubin, the Debtors' CRO, is the Borrower Representative.<br><br>***See* DIP Term Sheet, "BORROWERS" (both paragraphs) and "LENDER" (second paragraph).** |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Grizzly Investment Group, LLC or an affiliate thereof is the FitLabs DIP Lender; Golazo NV, a Belgian naamloze vennootschap, or an affiliate thereof is the Ragnar DIP Lender. Grizzly is an entity formed by Rod Trujillo, a member of certain Debtors' boards and an insider. Commitments are several, not joint. A default, funding failure, termination or acceleration for one group does not, by itself, affect the other group.<br><br>***See* DIP Term Sheet, "LENDER" (both paragraphs).** |
| **Term**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Maturity Date is January 24, 2027, ninety (90) calendar days after October 26, 2026, without adjustment solely because it is not a business day. Earlier repayment may occur by voluntary prepayment or valid acceleration after required notice. A sale, alternative bidder, failure to enter a stalking horse agreement, sale motion or plan does not by itself accelerate maturity, subject to the express Ragnar funding/refinancing provisions and mandatory sale-proceeds payments. The DIP Termination Date for each facility is the earlier of maturity and effective valid acceleration. The final Bankruptcy Milestone also refers to repayment upon an earlier sale of the DIP Lender's Collateral; the sale-payment provisions must be read together with the fixed-maturity language.<br><br>***See* DIP Term Sheet, "DIP FINANCING MATURITY"; "BANKRUPTCY MILESTONES" (final bullet); and "MANDATORY PREPAYMENTS."** |
| **Commitments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Maximum aggregate principal is $5,639,250: $5,150,000 FitLabs and $489,250 Ragnar. Upon the Interim Order and satisfaction or waiver of applicable Closing Conditions, the FitLabs DIP Lender shall immediately fund $2,150,000; up to $350,000 of Ragnar DIP Loans is available under the "Ragnar Funding" line. After the Final Order, each lender shall advance its remaining undrawn commitment subject to applicable conditions. Properly submitted draws must be funded within two business days; subsequent draws are limited to requested, reasonably required budgeted amounts, including permitted tolerances and cumulative unused carryforwards through maturity. Proceeds go to segregated accounts for the applicable Borrowers, with Carve-Out funding as provided in the Interim Order. No lender must exceed its commitment or Court-authorized limits; neither may veto the other group's budget or funding.<br><br>***See* DIP Term Sheet, "FACILITY"; "AVAILABILITY" (all paragraphs); and "PURPOSE."** |

[4] This summary is qualified in its entirety by the DIP Term Sheet. Any final credit agreement must conform to the DIP Term Sheet absent agreed, Court-approved changes.

| **Summary of Material Terms**[4] | |
|---|---|
| | |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Non-default interest is 12.0% per annum, accruing as simple interest only on outstanding principal actually advanced, payable at maturity, without monthly capitalization or interest on interest. Default interest is an additional 3.0% per annum only on affected outstanding DIP Loans, accruing from written notice of a continuing Event of Default after applicable cure periods expire, payable in cash monthly in arrears and ceasing on cure or waiver; no retroactive default interest applies.<br><br>***See* DIP Term Sheet, "INTEREST RATE" ("Non-default" and "Default").** |
| **Use of DIP Facility**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | DIP proceeds fund each applicable borrower group's working capital, operations and other costs, including allowed administrative expenses through maturity, under the Approved Budget, Permitted Variance, Professional Fee Tolerance and DIP Orders. Ragnar proceeds fund Ragnar operations and reasonably allocated estate administrative expenses and Carve-Out amounts reflected in "Ragnar Funding"; FitLabs proceeds fund corresponding FitLabs costs. Neither facility funds the other lender's fees or expenses.<br><br>***See* DIP Term Sheet, "PURPOSE" and "USE OF PROCEEDS."** |
| **"Roll Up" Provisions**<br><br><u>Local Rule 4001-2(a)(i)(E)</u> | No roll-up of prepetition debt is provided. The facility is new money, and outstanding principal consists only of amounts actually advanced.<br><br>***See* DIP Term Sheet, "FACILITY" and "AVAILABILITY" (second paragraph).** |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | Prepetition perfected secured lenders receive adequate protection only for demonstrated postpetition diminution in value of valid, perfected secured interests, as determined by the Court, through liens and claims authorized in the DIP Orders up to amounts provided in the DIP Budget. Such liens and claims are junior to applicable DIP Liens, DIP Obligations and the Carve-Out, subject to valid senior liens expressly preserved. Stipulations are limited to specifically identified obligations and liens verified after reasonable investigation, with challenge rights preserved; no admission of disputed claims or blanket release of lender misconduct claims is required.<br><br>***See* DIP Term Sheet, "ADEQUATE PROTECTION" ("DEBTORS' STIPULATIONS" and "ADEQUATE PROTECTION").** |
| **Mandatory Prepayments**<br><br>Local Rule 4001-2(a)(i)(E) | Unless waived in writing by the applicable DIP Lender, 100% of net proceeds of extraordinary asset dispositions (including the sale process), financing, refinancing, recapitalization and equity issuances must be applied immediately to applicable DIP Obligations. Net insurance, condemnation, litigation, tax-refund and other extraordinary receipts are included, except amounts budgeted for reinvestment or necessary operations or otherwise authorized by the Court after notice protecting lender rights. Additional extraordinary categories require express agreement and Court approval.<br><br>Proceeds from each group pay only that group's DIP Obligations, subject to the Carve-Out and preserved valid prior liens; no cross-group sweep applies. |



12158124.1

| **Summary of Material Terms**[4] | |
|---|---|
| | Subject to those priorities, first dollars of sale proceeds, including sales of a single Debtor's assets, are paid directly by the purchaser or closing agent to the applicable lender, bypassing operating accounts to the fullest extent permitted by the DIP Orders. Application is first to undisputed reimbursable expenses, then earned fees due, accrued interest properly due, principal and other undisputed DIP Obligations, without duplication. Timely disputed amounts may be reserved, and an itemized payoff statement is available on reasonable request.<br><br>The closing provisions require direct payment of sale and extraordinary proceeds and also refer to earlier application only on voluntary prepayment or valid acceleration, with escrow protections. These provisions must be read with the fixed-maturity language and the final milestone's earlier-sale repayment qualification; conforming DIP Orders must specify the applicable payment and escrow mechanics.<br><br>***See* DIP Term Sheet, "MANDATORY PREPAYMENTS" (all paragraphs and bullets); "DIP FINANCING MATURITY"; and "BANKRUPTCY MILESTONES" (final bullet).** |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Commitment Fee: 3.0% of each lender's binding commitments, subject to the applicable DIP Order, earned only as the commitment becomes legally available and the lender performs, and paid from that lender's first advance after availability. No fee is earned on unauthorized amounts or commitments withheld or terminated by lender breach; attributable prior payments are refunded or credited. Exit Fee: 1.0% of principal actually advanced, earned as advanced and paid proportionately with repayment, with remaining earned amounts due at final repayment or valid acceleration; no fee on undrawn commitments or availability termination alone, and no double counting. Both fees remain subject to Court review and preserved misconduct claims. Reasonable, documented, nonduplicative out-of-pocket counsel and one financial-advisor expenses per lender are payable only by its own Borrowers, subject to budget, invoice review and Court oversight. Bidder-only services, specified inter-lender disputes and duplication are excluded. Summary invoices go to the Debtors, counsel, U.S. Trustee and Committee counsel; disputed amounts do not prevent funding or trigger default before resolution.<br><br>**"DIP FEES" ("COMMITMENT FEE," "EXIT FEE," and "ATTORNEYS' FEES AND EXPENSES"); "APPROVED BUDGET AND REPORTING COMPLIANCE" (final lender-expense paragraphs).** |

| Summary of Material Terms[4] | |
|---|---|
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Approved Budget is a CRO-certified 13-week cash-flow and expense budget beginning on October 26, 2026, presented by Exhibit B Reporting Lines and updated at least every four weeks on a rolling basis with reconciliation. It must separately reflect Ragnar Funding and allocated Carve-Out amounts. Each lender approves only its own portion, with approval not unreasonably withheld, conditioned or delayed; updates are deemed approved absent written, detailed reasonable objections within three business days. One lender's objection does not block the other portion. Pending resolution, the existing budget, carryforwards and tolerances remain effective. Material Reporting Line variances exceeding the greater of 15% and $25,000 on a rolling four-week cumulative basis require narrative explanation; an individual line variance is not itself a default.<br><br>***See* DIP Term Sheet, "APPROVED BUDGET AND REPORTING COMPLIANCE" (first two paragraphs); "AVAILABILITY" (final paragraph).** |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Tested separately for each borrower group weekly on a rolling four-week cumulative basis beginning with the fourth full week after October 26, 2026, total receipts must be at least 75% of budget and operating disbursements may not exceed 125% of budget. Restructuring items, DIP interest and fees, sale-process costs and unbudgeted Court-authorized payments are excluded and reported separately. Ragnar Funding operating expenditures have the same 125% tolerance, without a separate 100% line-item cap or duplicate test. Professional fees paid are tested cumulatively from the Petition Date against 115% of cumulative budget, with unused amounts carried forward (the "<u>Professional Fee Tolerance</u>"). Unused budgeted amounts remain cumulatively available for draws through maturity. Variance and professional-fee breaches become defaults only after three business days following written notice and failure to cure; cure may result from actual qualifying performance, an approved or deemed-approved updated budget or written waiver. Mere payment deferral is not a cure. Tolerances do not increase commitments or Court-authorized limits; advances and non-default pricing continue during unexpired cure periods.<br><br>***See* DIP Term Sheet, "APPROVED BUDGET AND REPORTING COMPLIANCE" ("Permitted Variance," "Events of Default," and "Cure of Permitted Variance Breaches"); "AVAILABILITY" (third paragraph).** |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | (a) Events of Default are limited to the following enumerated events for the applicable borrower group, subject to applicable extensions, materiality standards and notice and cure protections:<br><br>(b) Failure to achieve an applicable Bankruptcy Milestone, subject to agreed extensions and the Court-scheduling extension described below;<br><br>(c) Entry of an order dismissing or converting the affected Bankruptcy Cases; or confirmation of a plan that fails to preserve and provide for payment of the affected DIP Obligations under the Term Sheet or other treatment agreed by the applicable DIP Lender; |

| Summary of Material Terms[4] | |
|---|---|
| | (d) Consummation of an unauthorized disposition materially impairing the affected lender's collateral or repayment rights;<br><br>(e) Appointment of a chapter 11 trustee for the affected Borrowers;<br><br>(f) Entry of an order granting liens senior to the affected DIP Liens, except the Carve-Out and priorities expressly permitted by the DIP Orders;<br><br>(g) Failure to obtain an applicable DIP Order by the applicable Bankruptcy Milestone, subject to the specified extensions;<br><br>(h) An uninsured, unstayed judgment or settlement requiring an unbudgeted cash payment exceeding $150,000 by the affected Borrowers without the applicable lender's consent, not unreasonably withheld, conditioned or delayed;<br><br>(i) Reversal, vacatur, stay or modification of a DIP Order materially impairing the affected lender's lien, priority or payment rights without its reasonable written consent;<br><br>(j) An unauthorized material prepetition payment not permitted by the DIP Documents or Court order:<br><br>i. A representation or warranty materially incorrect when made, subject to good-faith reporting protections;<br><br>ii. Failure to pay an undisputed DIP Obligation when due;<br><br>iii. A material covenant breach;<br><br>iv. As to Ragnar DIP Obligations only, cancellation of a planned race or event.<br><br>v. A curable judgment/settlement, unauthorized prepetition-payment, representation, payment or covenant default arises only if uncured five business days after written notice specifying the breach; principal due on the Maturity Date has no cure period. Reporting and variance defaults follow their specific cure provisions.<br><br>vi. Required reporting or notice omissions, excluding Monthly Reporting, become defaults only if uncured five business days after written notice; variance and professional-fee tolerance breaches have a three-business-day written-notice cure period. No funding restriction or default interest arises before the applicable cure period expires. |

| Summary of Material Terms[4] | |
|---|---|
| | vii. No event affecting only one borrower group defaults the other solely by reason of that event. Additional material defaults or earlier maturity require agreement and Court approval. Following a continuing uncured default, a written, docketed Termination Notice must identify the default and intended remedies and be delivered to the Debtors, counsel, U.S. Trustee and Committee counsel. Acceleration, commitment termination, cash-use termination, sweeps and enforcement become effective only after five business days, subject to cure, waiver or Court relief. Parties may seek an expedited hearing; necessary budgeted operations, payroll and Carve-Out cash use continue during that period, subject to Court order. No new funding is required during a continuing uncured default. Remedies reach only the applicable facility and its Collateral, subject to the Carve-Out, required stay relief and sale approval; default challenges and Court oversight are preserved.<br><br>***See* DIP Term Sheet, "DIP FINANCING MATURITY" (clauses (a)–(n) and concluding cure provisions); "APPROVED BUDGET AND REPORTING COMPLIANCE" ("Events of Default" and "Cure of Permitted Variance Breaches"); and "REMEDIES."** |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Term Sheet provides limited lender expense reimbursement and preserves claims arising from lender breach, fraud, gross negligence or willful misconduct as specified therein.<br><br>***See* DIP Term Sheet, "LOAN DOCUMENTS"; "DIP FEES" ("ATTORNEYS' FEES AND EXPENSES"); and "ADEQUATE PROTECTION" ("DEBTORS' STIPULATIONS").** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Bankruptcy Milestones are summarized below. The applicable lender may extend or waive a milestone in writing, with approval as stated in the Term Sheet. A Court-action milestone receives up to five (5) business days for delay solely due to Court scheduling despite diligent, timely efforts, but never beyond the fixed Maturity Date. Non-selection of a lender as stalking horse or purchaser is not a breach or funding excuse, subject to the express Ragnar-specific exceptions below.<br><br>(a) **By November 3, 2026**, all Debtors shall have signed the DIP Term Sheet.<br><br>(b) **By November 4, 2026,** the Debtors shall have signed definitive DIP documentation and filed the DIP financing motion.<br><br>(c) The Interim DIP Order shall be entered **within three (3) days** after the hearing on the DIP financing motion.<br><br>(d) The Final DIP Order shall be entered on or before **December 5, 2026**, subject to the specified extension provisions. |

| Summary of Material Terms[4] | |
|---|---|
| | (e) **By November 11, 2026,** the Debtors shall file a motion to approve a sale of all or substantially all assets, after reasonable consultation with the applicable DIP Lenders, consistent with fiduciary duties, the agreed timetable and protected lien and payment rights.<br><br>(f) The Ragnar Borrowers and Ragnar DIP Lender shall enter a stalking horse agreement by **December 9, 2026.**<br><br>(g) **December 29, 2026,** is the bid deadline, with no earlier deadline absent written agreement of the Debtors and applicable lender and Court approval,<br><br>(h) An order approving sale of substantially all assets shall be entered by **January 9, 2027**, subject to the specified extension provisions.<br><br>(i) The sale of substantially all assets shall close by **January 24, 2027**.<br><br>(j) Outstanding DIP Obligations shall be repaid by **January 24, 2027**, subject to voluntary prepayment or valid acceleration.<br><br>***See* DIP Term Sheet, "BANKRUPTCY MILESTONES" (introductory paragraph and all bullets); "CREDIT BID"; and "DIP FINANCING MATURITY."** |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | Atlas Credit Partners |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | The DIP Liens and superpriority claims are subject to the Carve-Out: (i) Clerk and U.S. Trustee fees under 28 U.S.C. § 1930 plus applicable statutory interest; (ii) reasonable trustee fees and expenses up to $25,000 under section 726(b); (iii) Court-allowed unpaid Debtor and Committee professional fees incurred through the first business day after a valid Carve-Out Trigger Notice, limited to applicable budget allocations and DIP Order limits; and (iv) an aggregate $150,000 post-trigger professional-fee cap, allocated between groups in the Approved Budget, not multiplied. The DIP Orders must specify that allocation before initial funding. Weekly estimated fees may be deposited into a separate Carve-Out Account outside lender control, with roll-forward/backward availability for the applicable professional. On trigger, before DIP payments, cash must fund the shortfall to the Professional Fee Carve-Out Cap, supplemented as cash becomes available; amounts paid after trigger reduce the account without replenishment. An account shortfall does not impair priority. A trigger notice may issue only after a continuing default and valid acceleration following the remedies notice period, to the Debtors, lead counsel, U.S. Trustee and Committee counsel. It affects only properly allocated fees of the defaulting |



12158124.1

| Summary of Material Terms[4] | |
|---|---|
| | group; shared fees are reasonably allocated by benefit without duplication, and unused nondefaulting-group cap amounts are preserved. Residual lender reversion arises only after all Carve-Out funding and final-order payment of allowed professional fees, up to payment in full of its own obligations. Carve-Out priority survives maturity, termination, acceleration and enforcement; restrictions and preserved enforcement rights are summarized separately below.<br><br>***See* DIP Term Sheet, "CARVE-OUT" (all paragraphs) and "USE OF PROCEEDS."** |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Each lender receives liens only on its own Borrowers' prepetition and postpetition property and proceeds, including cash, accounts, inventory, equipment, intellectual property, equity interests, insurance proceeds, commercial tort claims, avoidance actions and litigation claims and proceeds, subject to the Final DIP Order. Excluded are insider claims and claims against a DIP Lender or affiliates for DIP Document breach, fraud, gross negligence or willful misconduct, and their proceeds. Ragnar DIP Collateral secures only Ragnar DIP Obligations; FitLabs DIP Collateral secures only FitLabs DIP Obligations. Priority and priming exist only as expressly authorized by the DIP Orders, subject to the Carve-Out and preserved valid prior liens. The Term Sheet alone adjudicates no third-party ownership or lien rights.<br><br>***See* DIP Term Sheet, "COLLATERAL" (all paragraphs) and "DIP ORDERS."**<br><br>DIP Obligations constitute superpriority administrative expense claims solely against the applicable Borrowers, only as authorized in the DIP Orders and subject to the Carve-Out. No cross-group guarantee or superpriority claim is created. Each lender's control and enforcement rights are limited to its own facility and collateral, subject to cure, notice and Court oversight.<br><br>***See* DIP Term Sheet, "COLLATERAL" (second and third paragraphs).** |
| **506(c) Waiver; Section 552(b)**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x); 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(C); 4001-2(a)(i)(h) | The DIP Term Sheet does not expressly provide a section 506(c) surcharge waiver or a section 552(b) "equities of the case" waiver..<br><br>***See* DIP Term Sheet, "LOAN DOCUMENTS"; "ADEQUATE PROTECTION" ("DEBTORS' STIPULATIONS"); and "DIP ORDERS".** |
| **No Marshaling**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x); 4001(c)(1)(B)<br><br>Local Rule | No express marshaling waiver appears in the DIP Term Sheet. Any such relief separately requested by the Motion is limited to the Final Order, subject to the Carve-Out, confirmation, agreement and express Court approval.<br><br>***See* DIP Term Sheet, "LOAN DOCUMENTS" and "ADEQUATE PROTECTION" ("DEBTORS' STIPULATIONS"); no express marshaling waiver is specified.** |

| Summary of Material Terms[4] | |
|---|---|
| 4001-2(a)(i)(C);<br>4001-2(a)(i)(h) | |
| **Stipulations to Prepetition Liens and Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | Stipulations concerning prepetition debt and liens are limited to specifically identified obligations and liens verified by the Debtors after reasonable investigation, subject to challenge rights and periods expressly preserved in the DIP Orders.<br><br>The enforceability of the MCA Loans and the validity and perfection of the MCA Funders' purported security interests are disputed.<br><br>***See* DIP Term Sheet, "ADEQUATE PROTECTION" and "REPRESENTATIONS AND WARRANTIES" (Existing Liens/Exhibit C paragraph).** |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | 75 Days from entry of the Interim DIP Order.<br><br>***See* DIP Term Sheet, "ADEQUATE PROTECTION" ("DEBTORS' STIPULATIONS").** |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Stay modification is requested only to implement the DIP Orders and authorize specified perfection and enforcement acts. Following a continuing uncured default, enforcement, acceleration, cash-use termination and sweeps require the five-business-day Termination Notice period, remain limited to the applicable lender's facility and collateral, and are subject to the Carve-Out.<br><br>***See* DIP Term Sheet, "REMEDIES" (notice paragraph, enumerated remedies and concluding reservations).** |
| **Closing Conditions and Funding Protections** | Conditions apply solely to the affected Borrowers, lender and facility: effective applicable DIP Order; no trustee or expanded-powers examiner; no materially adverse DIP Order modification without reasonable consent; acceptable budget; valid, perfected DIP Liens and claims; corporate approvals, customary deliverables and borrowing notice; materially accurate representations; material compliance with DIP Orders; no continuing default after notice/cure; no specified Material Adverse Effect; undisputed fees paid or provided for after invoice review; no maturity, illegality or injunction; and compliance with Court borrowing limits. Initial deliverables need not be repeated absent material change or reasonably requested update. Unexpired cure periods and disputed invoices do not bar funding; additional discretionary conditions require agreement and Court approval. Material Adverse Effect excludes filings and foreseeable effects, previously disclosed circumstances, permitted budget performance and the agreed sale process, including an alternative bidder; another group's condition is not itself an adverse effect.<br><br>***See* DIP Term Sheet, "CONDITIONS PRECEDENT TO CLOSING DATE AND ADVANCES" (introductory paragraph and clauses (i)–(xv));** |



12158124.1

| **Summary of Material Terms**[4] | |
|---|---|
| | "AVAILABILITY." |
| **Reporting Requirements** | Weekly reports, due Wednesday after each budget week and separately presenting Ragnar, include CRO-certified variance comparisons, liquidity, revenues/processor receipts and settlements, receivable aging, funded/outstanding DIP Loans, payable aging and anonymized sale milestones. Bidder-lenders receive no competing bidder identities, bid terms or competitively sensitive information except under applicable protections. Good-faith reports and aging figures do not default or misrepresent, and later correction is permitted. Headcount is due Wednesday after each biweekly payroll. Monthly ordinary-course bookings, shipments, backlog, pipeline and purchase-order information is subject to commercially reasonable efforts within five business days; no new metrics or formats are required, and failure is not a default. Within three business days after CRO actual knowledge, notice is required of defaults, specified litigation over $150,000, regulatory adverse-effect matters, material contract termination, material operating disruptions and other material adverse effects. Material third-party notices accompany weekly reports, subject to privilege, confidentiality and sale protections.<br><br>***See* DIP Term Sheet, "APPROVED BUDGET AND REPORTING COMPLIANCE" ("Weekly Reporting," "Bi-weekly Reporting," "Monthly Reporting," and "Notices").** |
| **Representations and Covenants** | Agreed representations cover organization, authority, enforceability, financial condition, adverse changes, title/liens, litigation, taxes, legal compliance, employee benefits, environment and perfection/priority. Covenants include reasonably practicable advance review of material restructuring documents, subject to privilege, confidentiality and bidder protections; compliance with DIP Documents, Orders, milestones and budget; maintenance of cash/merchant controls, insurance, permits, records and service relationships; payment of postpetition taxes and administrative obligations; and commercially reasonable collateral preservation and sale assistance. After the FitLabs initial advance, aggregate unrestricted cash across all Debtors must be at least $100,000, not duplicated by group, with responsibility reasonably allocated in the budget.<br><br>***See* DIP Term Sheet, "REPRESENTATIONS AND WARRANTIES"; "AFFIRMATIVE AND NEGATIVE COVENANTS" (clauses (i)–(vii)).** |
| **Credit Bidding and Ragnar Stalking Horse** | After the Final DIP Order or earlier express Court authorization, each lender may credit bid only its own allowed secured DIP Obligations against its own Collateral, subject to section 363(k), limitations for cause and approved bidding procedures. Assignment to an affiliate, designee, vehicle or permitted assignee requires prior written notice and may not enlarge rights, release funding duties or bypass bidding/confidentiality protections. No lender is guaranteed stalking horse or successful-bidder status. The Ragnar-specific provision excuses further Ragnar funding if Ragnar's lender is not selected as stalking horse and provides refinancing by the selected stalking horse.<br><br>***See* DIP Term Sheet, "CREDIT BID"; "DIP FINANCING MATURITY" (Ragnar proviso); "BANKRUPTCY MILESTONES" (introductory** |

| Summary of Material Terms[4] | |
|---|---|
| | **paragraph, December 9, 2026 stalking horse bullet and bidding procedures bullet).** |
| **Voluntary Prepayments** | Permitted on three business days' prior written notice to the applicable lender, in minimum principal amounts of $50,000 or the smaller remaining balance, with accrued interest on prepaid principal, proportionate Exit Fee and other undisputed amounts due. No additional premium or penalty applies, and prepaid amounts may not be reborrowed.<br><br>***See* DIP Term Sheet, "VOLUNTARY PREPAYMENTS."** |
| **Restricted Uses and Preserved Rights** | The Carve-Out cannot fund equity distributions, unauthorized prepetition payments or challenges to authorized new-money DIP Liens/Obligations except as permitted by the DIP Orders or further order. This restriction does not bar good-faith DIP Document enforcement, fee/default objections, emergency remedies-period relief, investigation of prepetition claims within a Court-approved budget or Court-authorized lender breach/misconduct claims. Court jurisdiction and expressly preserved rights remain intact.<br><br>***See* DIP Term Sheet, "CARVE-OUT" (final paragraph, "Restricted Use"); "REMEDIES" (final paragraph).** |

## BACKGROUND

### I. CHAPTER 11 CASES

7. FitLab was developed as an integrated fitness and sport-lifestyle business bringing together brands serving the same consumer across fitness equipment, apparel and accessories, boutique studios, participation events, and digital fitness. Its strategy was to share technology, marketing, finance, and other infrastructure across the portfolio, reduce duplicated resources, and build customer relationships spanning multiple products and services. Liquidity constraints and recent dispositions have materially reduced the scope of that portfolio. Assault Fitness generated the vast majority of the business's revenue and all of its profitability before the Petition Date, and management intended to make it the focus of the restructuring. The Company sold Electric, agreed to a sale of Ragnar that had not closed as of the Petition Date, and pursued licensing of studio operations following termination of the Nike partnership. As of the Petition Date, the Debtors employed approximately 80 employees.

8. On October 26, 2026, October 27, 2026, and November 2, 2026, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned Chapter 11 Cases. For all DIP Term Sheet maturity, milestone, budget and other contractual calculations, "Petition Date" means October 26, 2026, as expressly defined in the DIP Term Sheet, regardless of an individual Debtor's later filing date. The Debtors are operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no committee, trustee or examiner has been appointed in these Chapter 11 Cases.

9. Additional Information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in the First Day Declaration and is incorporated herein by reference.

## II. THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND NEED FOR THE DIP FACILITY

### A. Prepetition Capital Structure

10. **Senior Financing.** FitLab arranged a senior secured financing through Atlas Credit Partners ("Atlas" and, the senior secured facility, the "Senior Facility") in connection with the Assault Fitness acquisition. An initial term sheet signed in July 2023 contemplated approximately $85 million, which was reduced through underwriting to $65 million. The financing was based on intellectual property and supported by creditor insurance. The first closing occurred on February 9, 2024, and the second and final closing occurred on July 10, 2025. Management estimates that the full $65 million facility produced just over $40 million in net proceeds after financing costs and related deductions. FitLab also entered into a settlement with Compass Point, the broker on that financing, under which FitLab remained responsible for nearly the full transaction fee

notwithstanding the difference between the financing originally contemplated and the secured-debt financing ultimately obtained.

11. **EIDL Loans and Lines of Credit.** Certain Debtors received economic injury disaster loans from the Small Business Administration (the "SBA"), secured by liens on the business assets of the recipient Debtors. The Debtors believe the aggregate principal amount owed to the SBA is $2,247,017. Yoga Vida LLC and MHRC UES LLC each arranged a line of credit with Chase Bank in the amount of $350,000, totaling $700,000 in secured obligations. *See* First Day Decl. ¶¶ 29–30.

12. **Junior Secured Loans.** The Debtors obtained junior secured loans from Mike DeMichele and Farhad Nanji, each in the principal amount of $2,500,000, totaling $5,000,000 in secured obligations. *See* First Day Decl. ¶¶ 31.

13. **Seller Notes and Equipment Finance Agreements.** The Debtors entered into seller notes in the principal amount of approximately $8,000,000. The lenders under the Senior Facility required subordination of those notes, and FitLab was unable to restructure them into a sustainable payment schedule. FL Victory LLC entered into equipment finance agreements for equipment needed for operations; the Debtors believe the aggregate principal amount owed under those agreements was $7,721,251. *See* First Day Decl. ¶¶ 33–34.

14. **MCA Loans.** Certain Debtors became parties to merchant cash advance loans (the "MCA Loans") with 17 different funding entities (the "MCA Funders"), totaling more than $15 million in aggregate principal amount. The Debtors believe the MCA Loans are criminally usurious and unenforceable under applicable nonbankruptcy law and subject to recharacterization and/or subordination under bankruptcy law. The Debtors also believe they have avoidance action and other claims against some or all of the MCA Funders. While those entities may purport to have

security interests in some or all of the Debtors' assets, the Debtors believe such interests are invalid because the underlying obligations are unenforceable, were not validly granted, were not properly perfected, or are otherwise subject to avoidance. *See* First Day Decl. ¶ 35.

15. **Other Obligations and Equity.** The Company estimates that it has raised approximately $18 million of standard convertible notes and approximately $3 million of inventory-backed notes. The Company estimates approximately $10 million to $20 million in junior credit plus accumulated accounts payable. Other obligations include studio leases, customer presales, and construction-related litigation claims. FitLab raised approximately $15 million of preferred equity through Series Seed and Series A rounds across 2019, 2020, and 2021, followed by a $25 million Series B round led by Nike's $20 million investment and the convertible-note financings described in the First Day Declaration. The Debtors' cofounders are collectively owed more than $2 million in unpaid management fees and additional unreimbursed expenses, and are estimated to have invested more than $1 million together in the recent period and provided various guaranties. *See* First Day Decl. ¶¶ 36–38.

**B. <u>Alternative Sources of Financing Are Not Readily Available</u>**

16. The Company's distress resulted from delayed and costly acquisition financing, operating losses and integration costs, substantial investment in Nike Studios followed by termination of that partnership, and supply-chain and inventory-financing disruptions affecting Assault Fitness. The initial Senior Facility funding yielded just over $20 million in net proceeds against a closing cash requirement of just over $21 million, and the second and final closing did not occur until approximately 17 months later. Nike terminated the partnership in early 2026, leaving FitLab responsible for the underlying leases. Assault Fitness also experienced tariff and supplier disruptions, and the loss of favorable supplier-credit terms required it to finance production in advance. Management reports that net revenue in the product business declined by

more than 50 percent in 2025 and estimates nearly $50 million in missed wholesale and direct-to-consumer orders. *See* First Day Decl. ¶¶ 39–49.

17. As liquidity deteriorated, collection activity by MCA Funders, including payment-redirect notices issued to payment processors, further restricted cash availability. As of the Petition Date, FitLab had more than $3 million in fully paid inventory in U.S. warehouses but could not ship sufficient volume to sustain operations. The Company also estimates approximately $3 million in unfulfilled Assault Fitness consumer presales and other inventory. Despite cost reductions that removed more than $10 million from the cost structure, additional financing efforts, the sale of Electric, and efforts to sell Ragnar and license studio operations, the Debtors could not resolve their liquidity crisis. Creditor enforcement and the cessation of shipments by their primary shipping partner led management to conclude that an out-of-court restructuring was no longer practical and that a court process offered a better opportunity to preserve creditor value than a forced liquidation. *See* First Day Decl. ¶¶ 50–59.

18. The Debtors commenced these Chapter 11 Cases with little cash on hand and require new funding and access to Cash Collateral to ensure sufficient working capital to operate their businesses, preserve and maximize estate value, administer their estates, and pursue a sale or plan. Their liquidity needs include payments to employees, vendors, landlords, taxing authorities and insurance companies. *See* First Day Decl. ¶¶ 60–61, 66. Under the November 3, 2026 DIP Term Sheet, requested interim authority is $2,500,000 in the aggregate: an immediate $2,150,000 FitLabs initial advance upon entry of the Interim Order and satisfaction or waiver of applicable conditions, and up to $350,000 for Ragnar under its budget line and draw procedures. Further advances are available after the Final Order within each lender's remaining commitment and applicable conditions. *See* DIP Term Sheet, "AVAILABILITY." Without additional funding and

continued cash-collateral use, the Debtors would suffer immediate and irreparable harm and be forced to pursue liquidation. *See* First Day Decl. ¶ 66.

19. Before the Petition Date, FitLab pursued asset-based financing with banks and specialty lenders, received several term sheets, and advanced certain discussions through successive credit committee reviews, but none resulted in a funded facility. The Company believes its existing debt structure and deteriorating results prevented prospective lenders from providing additional credit. Discussions concerning reduced cash interest, access to reserves or cash collateral, and a modest expansion of the Senior Facility likewise failed to produce a workable out-of-court solution. The DIP Facility was negotiated on behalf of the Debtors by Nicholas Rubin, as CRO, together with the Debtors' counsel and advisors. As set forth in the First Day Declaration, the DIP Facility is the only available financing that will permit the Debtors to preserve their value and administer their estates, subject to their continued search for any higher or better replacement facility. *See* First Day Decl. ¶¶ 54–58, 64–66.

## BASIS FOR RELIEF REQUESTED

### III. THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP LOAN DOCUMENTS

#### A. Entry Into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment

20. Section 364 of the Bankruptcy Code authorizes the Debtors to obtain secured or superpriority postpetition financing. Courts grant a debtor's business judgment considerable deference in obtaining postpetition secured credit provided the terms of such credit do not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect

that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21. To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *See In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves a "business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the Code"). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP Lender. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

22. The DIP Facility is a sound exercise of the Debtors' business judgment. It is necessary to fund the Debtors' postpetition operations, preserve and maximize estate value, and administer these Chapter 11 Cases while the Debtors pursue a marketing and sale process or a plan. The DIP Facility was negotiated in good faith and at arm's length among the Debtors and the

DIP Lenders and their respective counsel and advisors, with Nicholas Rubin, as CRO, negotiating on behalf of the Debtors together with their counsel and advisors. Mr. Rubin is familiar with the interest, fees, and affirmative and negative covenants of the DIP Facility and believes those provisions are reasonable and that the Debtors will be able to comply with them. Under his oversight, Force Ten worked with the Debtors to prepare the budget for operating and other administrative expenditures (the "Budget"), which he believes is fair, reasonable, and appropriate. The DIP Facility is the only available financing that will allow the Debtors to preserve their value and administer their estates, subject to their continued search for any higher or better replacement facility. *See* First Day Decl. ¶¶ 60–67. Thus, the Debtors should be authorized to enter into the DIP Documents and obtain financing on the terms set forth herein and in the proposed Interim Order.

**B. The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

23. The Debtors propose to grant the liens and superpriority claims described herein under sections 364(c) and 364(d) of the Bankruptcy Code, solely as expressly authorized in the DIP Orders. Each DIP Lender's liens and claims attach only to its own Borrowers and applicable DIP Collateral; no cross-group guarantee, lien or superpriority claim is created. The collateral exclusions, Carve-Out, valid prior liens expressly preserved and any required adequate protection apply. The DIP Term Sheet alone does not adjudicate third-party rights. *See* DIP Term Sheet, "COLLATERAL" and "DIP ORDERS." The proposed Orders must implement those limitations, with priming only to the extent approved by the Court.

24. In the event a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of



12158124.1

debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

A. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.,* by allowing a lender only an administrative claim;

B. the credit transaction is necessary to preserve the assets of the estate;

C. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC,* 457 B.R. at 312-13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37-40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

25. As described above and in the First Day Declaration, the Debtors' efforts to obtain asset-based financing did not result in a funded facility. Mr. Rubin believes the proposed DIP Facility is the only available financing that will allow the Debtors to preserve value and administer their estates, subject to the Debtors' continued search for any higher or better replacement facility. *See* First Day Decl. ¶¶ 54, 64.

26. Absent the DIP Facility, which will provide sufficient liquidity to administer these cases and execute the Debtors' sale process, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair and reasonable. For these reasons, the Debtors have met the standard to obtain postpetition financing under section 364(c) of the Bankruptcy Code.

27. If a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court may:

> Authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Accordingly, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

28. Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(c). The Court may authorize the "priming" liens proposed in the Motion if either (a) the prepetition secured parties have consented or (b) the prepetition secured parties' interests in their respective collateral are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

29. The Debtors seek approval of the proposed priming liens on the terms of the proposed Interim Order.

**C. <u>Alternatives to the DIP Facility Are Inferior</u>**

30. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *See In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987.) If only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1989); *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co., Inc.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores,* 115 B.R. at 37-39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

31. The Debtors' prepetition efforts to obtain asset-based financing from banks and specialty lenders did not result in a funded facility, and efforts to modify the Senior Facility or gain access to reserves or cash collateral failed to produce a workable out-of-court solution. *See* First Day Decl. ¶¶ 54–57. Mr. Rubin believes that the DIP Facility is the only available financing that will allow the Debtors to preserve their value and administer their estates, subject to a continued search for any higher or better replacement facility. *See id.* ¶ 64. The DIP Facility will support a comprehensive marketing and sale process led by Hilco Corporate Services, LLC, potential recoveries through litigation against the MCA Funders and other parties, and, if proceeds and recoveries permit, a chapter 11 plan providing meaningful recoveries for creditors. *See id.* ¶

67. Accordingly, the Debtors submit that the DIP Facility is their best available option to meet their urgent liquidity needs.

**D. The Debtors Should Be Authorized to Use the Cash Collateral and Provide Adequate Protection**

32. Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including cash collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2). The Debtors require continued use of cash collateral to avoid immediate and irreparable harm. *See* First Day Decl. ¶ 66.

33. Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Switzerland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th

ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

34. The Debtors propose to provide adequate protection for demonstrated postpetition diminution in value of valid, perfected prepetition secured interests, as determined by the Court, through liens and claims authorized by the DIP Orders up to amounts provided in the DIP Budget (the "Adequate Protection"). Such liens and claims are junior to the applicable DIP Liens, DIP Obligations and the Carve-Out, subject to valid senior liens expressly preserved. No disputed prepetition claim's amount, validity or priority is admitted. Stipulations must identify obligations and liens verified after reasonable investigation and preserve the DIP Orders' challenge rights. *See* DIP Term Sheet, "ADEQUATE PROTECTION."

35. The Debtors request authority to use Cash Collateral on the terms approved by the Court for the benefit of their estates and stakeholders.

**E. The Carve-out is Appropriate**

36. The DIP Liens, superpriority claims and Adequate Protection liens and claims are subject and subordinate to the Carve-Out. It includes statutory Clerk and U.S. Trustee fees, up to $25,000 of qualifying trustee expenses, budget-limited allowed professional fees through the first business day after a valid trigger notice, and an aggregate $150,000 post-trigger professional-fee cap allocated between the groups in the Approved Budget and specified in the DIP Orders before initial funding. The cap is not multiplied; a notice by one lender does not trigger the other group's cap. Carve-Out priority survives maturity, acceleration and enforcement. *See* DIP Term Sheet, "CARVE-OUT" and "ADEQUATE PROTECTION." These protections help ensure that the Debtors and any statutory committee can retain professional assistance.[5]

[5] *See, e.g.*, *In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 6, 2023) (Docket No. 271); *In re Sunlight Fin. Holdings, Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); *In re Western*

37. Without a Carve-Out, the estates may be deprived of meaningful professional assistance and the associated protection of stakeholder rights. *See Ames Dep't Stores*, 115 B.R. at 38. The Term Sheet permits weekly reserve deposits outside lender control and, on a valid trigger, requires funding of the shortfall to the Professional Fee Carve-Out Cap before payment of DIP Obligations, with later deposits as cash becomes available if cash on hand is insufficient. An account shortfall does not diminish Carve-Out priority. Shared costs and the aggregate post-trigger cap are reasonably allocated between borrower groups, subject to Court review. *See* DIP Term Sheet, "CARVE-OUT."

**F. The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility and Satisfy the Heightened Scrutiny Required for an Insider**

38. A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is generally governed by the business judgment standard. *See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)* ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. at 974 (noting that the interim loan, receivable facility and asset-based facility were approved because they

*Glob. Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); *In re Brooks Brothers Grp.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. March 20, 2018) (Docket No. 130); *Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (Docket No. 130); *In re Am. Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (Docket No. 248); *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (Docket No. 54).

"reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests of [the debtor] and its creditors.").

39. However, when a transaction is between a debtor and its insider, "courts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citation omitted). "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (*quoting Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)).

40. The Debtors submit that the proposed DIP Facility satisfies the heightened scrutiny applicable to an insider transaction. Grizzly Investment Group, LLC, one of the DIP Lenders, is an entity formed by Rod Trujillo, a member of certain of the Debtors' boards and an insider of the Debtors. The DIP Facility was negotiated on behalf of the Debtors by Nicholas Rubin, as CRO, together with the Debtors' counsel and advisors. Mr. Rubin believes the DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lenders and their respective counsel and advisors. He is familiar with the interest, fees, and covenants and believes those provisions are reasonable and that the Debtors will be able to comply with them. Force Ten also worked with the Debtors under his oversight to prepare the Budget, which he believes is fair, reasonable, and appropriate. *See* First Day Decl. ¶¶ 61, 63–66.

41. The Debtors commenced these Chapter 11 Cases with little cash on hand, and available resources are insufficient for ongoing operations and case administration without new financing. *See* First Day Decl. ¶¶ 60–61, 66. The requested interim DIP availability under the November 3, 2026 Term Sheet totals $2,500,000: $2,150,000 for FitLabs and up to $350,000 for

Ragnar, subject to their respective conditions and funding procedures; additional funding follows the Final Order within respective commitment limits. *See* DIP Term Sheet, "AVAILABILITY." Without additional funding and continued Cash Collateral use, the Debtors would suffer immediate and irreparable harm and be forced to pursue liquidation. *See* First Day Decl. ¶ 66.

42. FitLab pursued asset-based financing with banks and specialty lenders, received several term sheets, and advanced certain discussions through successive credit committee reviews; none resulted in a funded facility. Discussions concerning reduced cash interest, access to reserves or cash collateral, and a modest expansion of the Senior Facility likewise failed to produce a workable out-of-court solution. Mr. Rubin believes the proposed DIP Facility is the only available financing that will permit the Debtors to preserve their value and administer their estates, subject to their continued search for any higher or better replacement facility. *See* First Day Decl. ¶¶ 54, 57, 64.

43. The Debtors, through their CRO, counsel, and advisors, negotiated the DIP Facility with the DIP Lenders and their respective counsel and advisors in good faith and at arm's length. Mr. Rubin believes the terms and conditions are reasonable and that the DIP Facility is the only available financing that will allow the Debtors to preserve their value and administer their estates, subject to their continued search for a higher or better replacement facility. *See* First Day Decl. ¶¶ 63–66. This Court has previously approved debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions. *See, e.g.*, *In re BLH Topco LLC*, No. 25-10576 (CTG) (Bankr. D. Del. Apr. 24, 2025) (Docket No. 129); *In re Brightmark Plastics Renewal LLC*, No. 25-10472 (LSS) (Bankr. D. Del. Apr. 22, 2025) (Docket No. 152); *In re Viridos, Inc.*, No. 25-10697 (CTG) (Bankr. D. Del. Apr. 15, 2025) (Docket No. 16); *In re Smallhold, Inc.*, No. 24-10267 (CTG) (Bankr. D. Del. Apr. 17, 2024) (Docket No. 129).

44. The funds provided by the DIP Facility are essential to enable the Debtors to operate their businesses, preserve and maximize value, and administer their estates while pursuing their chapter 11 strategy. Failure to obtain additional funding and continued use of cash collateral would cause immediate and irreparable harm and force the Debtors to pursue a liquidation, adversely affecting their estates and creditors. *See* First Day Decl. ¶¶ 60, 66–67.

45. Accordingly, under sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from their respective DIP Lenders on the terms of the DIP Term Sheet and conforming DIP Documents.

## IV. THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS UNDER SECTION 364(e) OF THE BANKRUPTCY CODE

46. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor in possession, and any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

47. As explained herein and in the First Day Declaration, Mr. Rubin believes the proposed DIP Facility is the only available financing that will allow the Debtors to preserve their value and administer their estates, subject to their continued search for any higher or better replacement facility. The DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lenders and their respective counsel and advisors, with Mr. Rubin,

as CRO, negotiating on behalf of the Debtors together with their counsel and advisors. *See* First Day Decl. ¶¶ 64–66. The proceeds will be used only for purposes permissible under the Bankruptcy Code. Accordingly, the Debtors submit that the DIP Lenders are good-faith lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to the protections afforded thereunder.

## V. THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

48. The Debtors request limited modification of the automatic stay to implement the DIP Orders and permit the DIP Lenders to take authorized perfection acts for their respective liens. Enforcement remains subject to the DIP Term Sheet's applicable cure periods and written, docketed Termination Notice delivered to the Debtors, counsel, U.S. Trustee and Committee counsel. Acceleration, commitment termination, cash-use restrictions, sweeps and collateral enforcement cannot become effective until five business days after delivery, and then only for the affected lender's own facility and Collateral, subject to the Carve-Out, Court oversight and any required stay relief or sale approval. During notice, parties may seek expedited Court relief and the Debtors may continue necessary budgeted operations, payroll and Carve-Out cash use, subject to Court order. No lender must advance during a continuing uncured default. No lender may terminate or accelerate the other facility, and the Debtors retain default-contest and enforcement rights. *See* DIP Term Sheet, "REMEDIES."

49. Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these cases. *See, e.g., In re SiO2 Medical Prods., Inc.,* No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Extraction Oil & Gas, Inc.,* No.

20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).

## VI. FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO THE DIP FACILITY WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM

50. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after service of such motion. However, upon request, the Court may conduct a preliminary, expedited hearing on the motion and authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the estate.

51. For the reasons described above and in the First Day Declaration, the Debtors have a critical and immediate need for DIP liquidity and access to Cash Collateral. *See* First Day Decl. ¶¶ 60–61. The Debtors request interim borrowing authority of $2,500,000, consisting of a $2,150,000 FitLabs initial advance and up to $350,000 of Ragnar advances under the respective conditions, budget and draw procedures. *See* DIP Term Sheet, “AVAILABILITY.” Without additional funding and continued Cash Collateral use, the Debtors would suffer immediate and irreparable harm and be forced to pursue liquidation. *See First Day Decl.* ¶ 66. The financing supports the marketing and sale process, potential litigation recoveries and, if proceeds and recoveries permit, a chapter 11 plan providing meaningful creditor recoveries. *See id.* ¶ 67.

52. The Debtors request an interim hearing and entry of the Interim Order authorizing up to $2,500,000 of interim DIP borrowing, allocated $2,150,000 to FitLabs and up to $350,000 to Ragnar, subject to the applicable closing and draw conditions and separate obligations, collateral and funding protections. This relief will enable preservation and maximization of value and avoid immediate and irreparable harm pending the Final Hearing. *See* DIP Term Sheet, “FACILITY” and “AVAILABILITY.”

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

53. To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As set forth above, the relief requested herein is needed to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and efforts to pursue a successful resolution to these cases.

## NOTICE

54. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney for the District of Delaware; (c) the attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) counsel for each DIP Lender; (f) the holders of the thirty (30) largest claims against the Debtors on a consolidated basis; and (g) all parties requesting notice in these cases. Notice of this Motion and any order entered on this Motion will be served as required by Local Rule 9013-1(m). The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim Order substantially in the form attached hereto, (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter the Final Order, and (iv) grant such further relief as may be just and proper.

Dated: November 4, 2026

Respectfully submitted,

**RAINES FELDMAN LITTRELL LLP**

/s/ *Thomas J. Francella, Jr.*
Thomas J. Francella, Jr. (No. 3835)
Matthew P. Milana (No. 6681)
824 N. Market Street, Suite 805
Wilmington, DE 19801
Telephone: (302) 772-5803
Email: tfrancella@raineslaw.com
mmilana@raineslaw.com

-and-

Sarah E. Wenrich
11 Stanwix Street, 15th Floor
Pittsburgh, PA 15222
Telephone: (412) 899-6460
Email: swenrich@raineslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*