**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FitLab Inc.,[1] | Case No. 26-11681 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF NICHOLAS RUBIN AS
CHIEF RESTRUCTURING OFFICER OF THE DEBTORS
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Nicholas Rubin, hereby declare under penalty of perjury as follows:

1. I am a partner with Force Ten Partners, LLC ("**Force Ten**"), a financial advisory firm with extensive experience in chapter 11 bankruptcy cases. Pursuant to Force Ten's engagement agreement with FitLab Inc. ("**FitLab**") and its affiliated debtors (collectively, the "**Company**" or the "**Debtors**"), I have been appointed as the Company's Chief Restructuring Officer ("**CRO**"). I have personal knowledge of the facts set forth in this Declaration, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect to such facts.

2. The Company retained Force Ten prior to the Company's bankruptcy filing to provide financial advisory and CRO services. Force Ten has extensive experience providing CRO

[1] The Debtors in these chapter 11 cases and the last four digits of their tax identification numbers are: (1) FitLab Inc. (0335); (2) FL Events LLC (4931); (3) FL Studios LLC (0684); (4) FL Studio Partners LLC (3332); (5) FL Victory LLC (4966); (6) FL Digital LLC (3337); (7) FL Xtreme LLC (0335); (8) XPT Life LLC (6716); (9) Ragnar Holdings LLC (3664); (10) Ragnar Events LLC (5737); (11) Sauma, LLC (NA); (12) Yoga Vida LLC (5646); (13) Electric Visual Evolution LLC (7533); (14) Novo Fitness Inc. (7187); (15) RPM Fitness Inc. (8361); (16) LifeCore Fitness, LLC (6993); (17) Y7 Holdings LLC (4768); (18) Y7 Studios LLC (7905); (19) Y7 Management LLC (4875); (20) Mile High Run Club, LLC (6820); (21) Mile High Run Club Studio 2, LLC (0491); (22) MHRC UES LLC (5344); (23) MHRC Management Inc. (4271); (24) FitLab Fund Management LLC (8971); (25) FitLab Fund Founders LLC (9620); (26) FitLab Fund I, L.P. (1829); (27) Weight X, Inc. (NA); (28) FL Merch LLC (NA); (29) FitLab, LLC (0535); (30) FitLab Fund General Partner, LLC (0392); (31) Ragnar RTB, LLC (1963). The Debtors' mailing address is c/o Force 10 Partners, 5271 California Avenue, Suite 270, Irvine, CA 92617.

services and serving as an independent director or financial advisor to debtors, creditors, trustees, committees, and other parties in interest in bankruptcy matters.

3. I have approximately twenty (20) years of experience providing financial advisory, restructuring, and turnaround services and have advised chapter 11 debtors across a diverse range of industries. Recent bankruptcy cases in which I served as CRO include *In re GST, Inc.*, No. 25-12188 (Bankr. D. Del. 2025); *In re Fu Bang Group Corp. USA*, No. 25-13004 (Bankr. C. D. Cal. May 7, 2025); *In re Adelaida Cellars, Inc.*, No. 24-11409 (Bankr. C. D. Cal. Dec. 13, 2024); *In re Reliant Life Shares, LLC*, No. 24-11695 (Bankr. CC.D. D. Cal. Oct. 7, 2024); *In re Contour Propco 1735 S. Mission LLC*, No. 23-12081 (Bankr. D. Nev. May 23, 2023); *In re Rubio's Restaurants, Inc.*, No. 20-12688 (MFW) (Bankr. D. Del. Oct. 26, 2020); *In re Alpha Guardian, a Nevada Corp.*, No. 20-11016 (Bankr. D. Nev. Feb. 24, 2020); and *In re Pacific Mortgage Exchange*, No. 17-15082 (Bankr. C. D. Cal. July 13, 2017).

4. Force Ten was engaged by the Company on October 13, 2026, to provide certain financial advisory services and to assist the Company in connection with creditor negotiations. As of October 22, 2026, Force Ten was engaged by the Company to provide executive and restructuring services, including my service as CRO for the Company. I have served as CRO of the Company since October 22, 2026 and have been involved with the Company's restructuring efforts and negotiations with creditors. Based on my experience with the Company, my discussions with the Company's management, and my review of the Company's books and records, I am familiar with the Company's debt structure and day-to-day operations. I am likewise familiar with the Company's corporate structure, vendors, and service providers. As CRO, I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors.

5. I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on October 26, 2026, October 27, 2026, and November 2, 2026 (collectively, the "**Petition Date**"), commencing these chapter 11 cases (the "**Chapter 11 Cases**"). I also submit this Declaration in support of the relief requested in the motions and application filed in connection with the commencement of the Chapter 11 Cases (the "**First Day Motions**").

6. Unless otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, my review of the Debtors' books and records and other relevant documents, information provided to me by the Debtors' personnel and advisors, and my experience in my position. If called upon to testify, I could and would testify competently to the facts set forth herein.

7. This Declaration describes the Debtors' businesses, the Debtors' corporate and capital structure, the circumstances leading to the Chapter 11 Cases, the Debtors' anticipated objectives in these cases, and the factual basis for the First Day Motions.

## BUSINESS BACKGROUND AND OPERATIONS

8. FitLab was developed as an integrated fitness and sport-lifestyle business bringing together brands serving similar consumers across fitness equipment, apparel and accessories, boutique studios, participation events, and digital fitness. Its strategy was to share technology, marketing, finance, and other infrastructure across the portfolio, reduce duplicated resources, and build customer relationships spanning multiple products and services.

9. FitLab organized its strategy around integrating products and services, with studios and events intended to introduce customers to the broader product portfolio. As discussed below, the Company's liquidity constraints and recent dispositions have materially reduced the scope of that portfolio.

### Products and Fitness Equipment

10. **Assault Fitness.** Assault Fitness is a functional-conditioning equipment business whose products include the AssaultBike, AssaultRower, and AssaultRunner. FitLab acquired Assault Fitness in February 2024. Prior to the Petition Date, Assault Fitness generated the vast majority of the business's revenue and all of its profitability, and management intended to make it the focus of the restructuring. Its international distributor business continued to generate receipts, although domestic shipments were severely constrained by liquidity and logistics issues.

11. **RPM Training.** FitLab's product portfolio also includes RPM Training, a smaller business focused primarily on jump ropes. The Company's shortage of working capital restricted its ability to fund inventory for RPM Training and other businesses.

**Boutique Fitness Studios**

12. **Mile High Run Club.** FitLab acquired Mile High Run Club as part of its studio portfolio. Mile High Run Club offers treadmill-based interval and strength-training classes.

13. **Other Studio Concepts.** FitLab's acquisitions also included Sanctuary Fitness, also known as Novo Fitness, and Yoga Vida, both of which were subsequently closed.

14. **Y7 Studio.** FitLab acquired Y7 Studio, a yoga studio business, at the end of 2025 for approximately $14 million in FitLab common stock, excluding the management incentive pool. The acquisition added eight studios in Los Angeles, New York, and Austin.

**Events and Performance Training**

15. **Ragnar.** Ragnar operates road and trail relay events. FitLab acquired Ragnar in October 2021 and subsequently reduced events with inadequate economics and shifted the event mix toward trail races in an effort to improve profitability. By late summer 2026, liquidity constraints caused management to conduct certain event cancellations, which resulted in associated participant refund obligations. As of the Petition Date, a prospective transaction had not closed, although a partner had funded the vast majority of recent race expenses.

16. **XPT.** XPT, or Extreme Performance Training, was an early FitLab investment and became part of the operating-company structure as FitLab transitioned from minority investing to an integrated platform. FitLab also used its digital app platform for XPT.

**Digital Platforms and Other Businesses**

17. FitLab developed an app platform that could be adapted for multiple brands and used it for XPT, McGregor FAST, and Spartan Race. A joint venture associated with Conor McGregor closed in early January 2021, and the McGregor FAST app launched that month. FitLab also acquired Fitplan in approximately April 2021. As described below, those initiatives did not achieve the anticipated sustained performance.

**Operating Footprint and Stakeholders**

18. At its peak, FitLab's combined studio portfolio reached approximately 20 locations, and the business employed more than 400 people, principally studio staff, trainers, and other studio and event operating personnel. As of the Petition Date, the Debtors employ approximately 80 employees after certain reductions in force, closures, dispositions, or licensing efforts.

## <u>TRANSACTION HISTORY AND CORPORATE STRUCTURE</u>

19. FitLab's initial development began in 2016, when entities were formed in the second half of the year. The first investment closing occurred on June 1, 2017. The original vehicle was a small venture fund and studio with approximately $5 million in capital. Early investments included XPT, Freeletics, Momentous, and RPM Training. Management concluded that minority ownership limited its ability to integrate businesses whose boards and objectives were not aligned.

20. By late 2018, the Company began transitioning to an operating-company model. The operating entity was formed in late December 2018 as MVMNT Inc., and the operating strategy began functionally in early 2019. MVMNT Inc. changed its name to FitLab Inc. in March

2021. XPT became part of the early structure, with the fund's investment held as a convertible note in MVMNT Inc.

21. The Company believed that a customer's spending across events, studios, equipment, apparel, and digital fitness could support a broader relationship with an integrated platform. Shared services and cross-brand introductions were intended to improve customer acquisition and retention while reducing duplicated costs. Studios were initially expected to lead the rollout, and FitLab entered a partnership contemplating hundreds of franchise locations. The COVID-19 pandemic interrupted those plans before any of those locations were built, prompting a shift toward digital fitness and products.

22. FitLab acquired Electric Visual Evolution LLC ("**Electric**") in early 2020 after identifying the opportunity in late 2019. Electric was intended to become the apparel and accessories component of the platform. Wholesale represented approximately 80 percent of Electric's business and was severely disrupted by the pandemic. FitLab shifted resources toward e-commerce and more than doubled that segment during the year, then worked to rebuild wholesale. By the Company's own admission, the changes necessary to develop Electric into the intended strategic asset took too long.

23. FitLab's digital expansion included the McGregor FAST joint venture and the acquisition of Fitplan, which closed on approximately April 30, 2021. Completion of the McGregor FAST transaction and related offering took long enough that the business missed much of the pandemic-driven increase in digital-fitness demand. Fitplan required substantial reworking of its platform and economics, including content-partner payment arrangements, as demand for fitness apps weakened following the pandemic. The Fitplan acquisition also brought nearly $8 million in seller-note principal, plus accrued interest.

24. In October 2021, FitLab acquired Ragnar for approximately $9 million in common stock. Before the pandemic, Ragnar generated more than $20 million in annual revenue; at the time of the closing of the acquisition, revenue had declined to approximately $2 million. Suspended events, spent registration proceeds, and accumulated liabilities created a substantial rehabilitation task. FitLab reduced events with inadequate economics and increased the emphasis on trail races, which generally offered a better financial return relative to their costs. Cash burn declined more slowly than needed, and inherited past-due liabilities were more significant than the diligence had indicated.

25. FitLab entered a letter of intent for Assault Fitness in late March 2022 and completed the acquisition on February 9, 2024. The transaction was ultimately valued at approximately $55 million, consisting of $35 million in cash before offsets for assumed indebtedness, tax reserves, and negotiated holdbacks, and $20 million in FitLab common stock. An additional earnout contemplated earlier in the process was reduced and restructured as performance changed; no earnout was ultimately earned or paid.

26. While the Assault Fitness acquisition was pending, Nike, Inc. ("**Nike**") led FitLab's Series B financing with a $20 million investment, and the companies entered a partnership to develop a pilot of 10 Nike studios ("**Nike Studios**") in Southern California and the Austin, Texas area. FitLab committed substantial resources to those locations. At the end of 2025, it also acquired Y7 for approximately $14 million in FitLab common stock, excluding the management incentive pool. Other acquisitions included Mile High Run Club, Sanctuary/Novo Fitness, RPM, and Yoga Vida. The subsequent termination of the Nike partnership, closure of Yoga Vida, sale of certain assets of Electric, and efforts to dispose of Ragnar and license studio operations materially changed the portfolio.

## CAPITAL STRUCTURE AND FINANCIAL CONDITION

27. **Senior Financing.** FitLab arranged a senior secured financing through Atlas Credit Partners ("**Atlas**," and the senior secured facility, the "**Senior Facility**") in connection with the Assault Fitness acquisition. An initial term sheet signed in July 2023 contemplated approximately $85 million, which was reduced through underwriting to $65 million. The financing was based on intellectual property and supported by creditor insurance. The first closing occurred on February 9, 2024, and the second and final closing occurred on July 10, 2025. Management estimates that the full $65 million facility produced just over $40 million in net proceeds after financing costs and related deductions.

28. In connection with the Senior Facility, FitLab also entered into a settlement with Compass Point, the broker on that financing, under which FitLab remained responsible for nearly the full transaction fee notwithstanding the difference between the unsecured financing originally contemplated and the secured-debt financing ultimately obtained.

29. **EIDL Loans.** Prior to the Petition Date, in the ordinary course of business, certain of the Debtors received economic injury disaster loans ("**EIDL Loans**") from the Small Business Administration (the "**SBA**"). The EIDL Loans were secured by liens on the business assets of the Debtors that received them. The Debtors believe that they are obligated to the SBA on the EIDL Loans in the principal amount of $2,247,017.

30. **Lines of Credit.** Prior to the Petition Date, Debtors Yoga Vida LLC and MHRC UES LLC (a Mile High Run Club location) each arranged for a line of credit with Chase Bank (collectively, the "**Lines of Credit**"), each in the amount of $350,000, totaling $700,000 in secured obligations on account of the Lines of Credit.

31. **Junior Secured Loans.** Prior to the Petition Date, the Debtors obtained junior secured loans from two individuals, Mike DeMichele and Farhad Nanji (collectively, the "**Junior**

**Secured Loans**"), each in the principal amount of $2,500,000, totaling $5,000,000 in secured obligations.

32. **Seller Notes.** Prior to the Petition Date, the Debtors entered into certain seller notes (the "**Seller Notes**") in the principal amount of approximately $8,000,000. The Seller Notes became a significant burden when the attached business failed to perform as expected. The lenders under the Senior Facility required subordination of the Seller Notes, and FitLab was unable to restructure them into a sustainable payment schedule. Some holders settled, but most did not, and even settlement payments exceeded the business's capacity.

33. **Equipment Finance Agreements.** Debtor FL Victory LLC entered into certain equipment finance agreements (the "**Equipment Finance Agreements**") for equipment needed for operations. The Debtors believe the aggregate principal amount owed in connection with the Equipment Finance Agreements was $7,721,251.

34. **MCA Loans.** Prior to the Petition Date, certain of the Debtors became parties to merchant cash advance and similar loans (the "**MCA Loans**") with 17 different funding entities (the "**MCA Funders**"), totaling more than $20 million in aggregate payback amount, approximately $5 million of which having been repaid as of the Petition Date. The Debtors believe they may have claims and causes of action against some or all of the MCA Funders.

35. **Other Obligations and Equity.** The Company estimates that it has raised approximately $18 million of standard convertible notes and approximately $3 million of inventory-backed notes. In addition, the Company estimates approximately $10 million to $20 million in junior credit plus accumulated accounts payable. Other obligations include, but are not limited to, studio leases, customer presales, and construction-related litigation claims.

36. FitLab previously raised approximately $15 million of preferred equity through Series Seed and Series A rounds across 2019, 2020, and 2021, followed by a $25 million Series B round led by Nike's $20 million investment and the convertible-note financings discussed in this Declaration.

37. The Debtors' cofounders are collectively owed more than $2 million in unpaid management fees and additional unreimbursed expenses, which remain unpaid to leave cash available to the Debtors' businesses. It is also estimated that, together, the cofounders invested more than $1 million in the recent period and provided various guaranties associated with the MCA Loans, Equipment Finance Agreements, and COVID-related payroll tax liens.

## EVENTS LEADING TO THE CHAPTER 11 CASES

38. The Company's financial distress developed from the combined effects of delayed and costly acquisition financing, operating losses and integration costs across its portfolio, substantial investment in Nike Studios followed by termination of that partnership, and severe supply-chain and inventory-financing disruptions impacting Assault Fitness. As liquidity deteriorated, the Company became unable to fund inventory and ordinary operations, while creditor collection activity, particularly payment-redirect notices issued by the MCA Funders to the Debtors' payment processors, further restricted access to cash and shipments. The Company also believes that the business was insufficiently capitalized for its strategy and that overhead reductions were not implemented quickly enough.

**Delayed Acquisition Financing and Limited Working Capital**

39. In connection with the Assault Fitness acquisition, the Debtors obtained the Senior Facility, which was initially sized at $65 million, but the Debtors' ability to draw down was constrained to $35 million in gross proceeds at the initial February 9, 2024, closing. Certain events and circumstances in connection with the Senior Facility had already extended the process to seven

months, and believing the acquisition would otherwise be lost, FitLab proceeded with the initial funding.

40. After premiums, costs, paydowns, and other reserves, the initial funding yielded just over $20 million in net proceeds against a closing cash requirement of just over $21 million. FitLab negotiated the deferral of a portion of professional-services expenses to complete the transaction, but was left with a larger footprint and no additional working or growth capital.

41. The second and final closing occurred on July 10, 2025, approximately 17 months after the initial funding. Once additional insurance capacity became available, FitLab had to procure a replacement lender. By the time the additional proceeds arrived, accumulated obligations and prepaid-inventory requirements consumed much of the liquidity.

42. The Company estimates that of the $65 million facility, the Debtors were only able to drawdown on just over $40 million in net proceeds. The Company believes its debt structure materially impeded a separate asset-based inventory facility. As a result, the Company carried significant debt without the working capital necessary to realize the intended benefits of the acquisition.

**Nike Studios Investment and Partnership Termination**

43. FitLab spent substantially all of Nike's $20 million Series B investment developing, launching, and operating the 10-studio pilot. Permitting and construction took longer than anticipated. While the Company reported strong customer satisfaction, including net promoter scores above 80, and strong revenue at the locations, inconsistent operating profitability impeded stable growth. Maintaining the intended service and brand standards required high costs, attributable both to those standards and FitLab's staffing and service decisions. FitLab made staffing cuts toward the end of 2025, but the initiative had consumed substantially all of Nike's $20 million investment.

44. Nike terminated the partnership in early 2026, and as part of the partnership agreement, the Company agreed to assume responsibility for the underlying leases. FitLab was therefore left with 10 locations that could no longer operate as Nike Studios after more than two years of investment. Closures reduced the scale of the studio division in 2026 and left continuing landlord issues while the Company was already struggling to fund other operations.

**Supply Disruptions and Loss of Inventory Credit**

45. During 2025, Assault Fitness faced substantial uncertainty concerning import costs and customs releases following material tariff changes beginning in April 2025. Around the same period, issues with Impulse Fitness ("**Impulse**"), a major manufacturer, required FitLab to move production to a replacement supplier identified by management as Arcana. The transition took approximately six to eight months and left Assault Fitness effectively out of the market for an extended period, including much of the 2025 holiday selling season, historically its most profitable period.

46. The Impulse issue also affected trade credit insurance. The Company reported that the Impulse balance had been approximately $4 million and had been reduced to approximately $1.646 million. That remaining unpaid obligation is separate from balances with current manufacturers, which the Company believes had been brought current. Management reports that Sinosure China Export & Credit Insurance Corporation ("**Sinosure**") effectively excluded FitLab from coverage because of the Impulse issue, eliminating favorable payment terms previously offered by manufacturers.

47. Before the loss of coverage, the Company estimates that it benefited from more than $5 million, and possibly approximately $7 million, in supplier credit on terms of 60 days or more. FitLab then had to finance production in advance and pay in full before goods were released.

Without an asset-based facility, it had to fund manufacturing, transportation, and the period before customer payment from already-constrained resources.

48. Management reports that net revenue in the product business declined by more than 50 percent in 2025 and estimates nearly $50 million in missed wholesale and direct-to-consumer orders. These disruptions were the largest unfavorable effect on 2025 performance. Because profits from Assault Fitness had helped support the service businesses, the decline also reduced the resources available to the rest of the Company's portfolio.

**Operating Costs and Creditor Pressure**

49. FitLab's expanded portfolio carried substantial payroll, lease, and shared-overhead requirements. Management acknowledges that overhead remained excessive from 2022 into the middle of 2025, while substantial capital was also being committed to Nike Studios. The Company retained more employees than it could sustain and did not make necessary integration and staffing changes aggressively enough. Later savings did not remedy the working-capital shortage or restore sufficient funding for inventory, studio marketing, and the member experience.

50. With conventional financing unavailable, FitLab used short-term, high-rate merchant cash advances through the MCA Loans, which were presented to Company management as variable receivables financing. Given the Debtors' liquidity crunch, these advances became the only financing available to ship product, meet payroll, and continue operations. Shortly after agreeing to the MCA Loans, the Debtors faced collection pressure from the MCA Funders, some of which asserted holds or liens. Following communications with the MCA Funders and payment processors and the issuance of payment-redirect notices, the Company's funds were withheld, further reducing its operating cash.

51. As of the Petition Date, FitLab had more than $3 million of fully paid inventory (at retail value) in U.S. warehouses. An arrangement with the third-party logistics provider had

permitted some shipping despite payment issues, but inventory levels, shipment volume and pace were insufficient to sustain operations.

52. The Company also estimates approximately $3 million in liabilities on account of unfulfilled Assault Fitness consumer presales. These unfulfilled orders damaged customer confidence.

53. From 2024 through 2026, FitLab implemented multiple reductions in force and exited acquired office leases, separate from its continuing studio lease obligations. The Company estimates that staffing and other overhead reductions removed more than $10 million from the cost structure. The Company then raised financing in the second half of 2024 under the Convertible Note, completed an initial closing in May 2025, and raised additional capital under that Convertible Note later in 2025. These measures did not produce sufficient working capital to stabilize the business.

**Efforts to Obtain Additional Financing and Right-Size the Portfolio**

54. As pressures continued to mount and no additional significant financing materialized, FitLab pursued asset-based financing with banks and specialty lenders, received several term sheets, and advanced certain discussions through successive credit committee reviews. None resulted in a funded facility. The Company believes the existing debt structure and deteriorating results prevented prospective lenders from providing additional credit. By summer 2026, the Company concluded that it could no longer rely on substantial new institutional equity or asset-based financing.

55. The Company then sought to simplify the business around Assault Fitness by selling certain assets of Electric and Ragnar and licensing the studio businesses to other operators after the Nike partnership ended. Restrictions under the Senior Facility prevented efficient releases of assets or intellectual property, limiting available transaction structures and counterparties.

56. The Company generated additional funds by selling certain assets of Electric, receiving meaningful cash consideration and obtaining the assumption of liabilities associated with a segment that had been wound down and generated no revenue for several months. The Company also agreed to a sale of Ragnar; however, that transaction had not closed as of the Petition Date.

57. Additionally, complex lender and insurer approval requirements slowed the Company's prepetition divestiture efforts. The sale of Electric and proposed sale of Ragnar did not transfer costs, employees, and other obligations quickly enough to resolve the liquidity crisis. Discussions concerning reduced cash interest, access to reserves or cash collateral, and a modest expansion of the Senior Facility likewise failed to produce a workable out-of-court solution.

58. The immediate crisis intensified as creditor enforcement and logistics restrictions impaired the Company's ability to convert inventory into cash. These pressures included (i) a dispute with a counterparty that obtained a writ of attachment in September 2026, (ii) holdbacks, liens, and legal proceedings instituted by the MCA Funders, and (iii) the cessation of shipments by the Debtors' primary shipping partner because of payment issues.

59. With shipments halted and additional capital unavailable, management concluded that an out-of-court restructuring was no longer practical and that a proactive court process offered a better opportunity to preserve creditor value than the risk of a forced liquidation.

**LIQUIDITY NEEDS**

60. As described above, the Debtors commenced these Chapter 11 Cases with little cash on hand and require new funding to ensure sufficient working capital to operate their businesses, preserve and maximize the value of their estates, administer their estates, and pursue a sale of their assets or a plan resolving these Chapter 11 Cases. The Debtors' liquidity needs include payments to employees, third-party vendors, landlords, taxing authorities, and insurance companies to fund operations and maintain and insure their assets. For these reasons and the

reasons described herein, I believe that the Debtors' proposed postpetition debtor-in-possession financing facility (the "**DIP Facility**") is necessary for the Debtors to execute their chapter 11 strategy.

61. The DIP Facility is a new-money, superpriority senior secured, priming, delayed-draw term loan facility in the maximum aggregate principal amount of $5,639,250. The Debtors require approximately $2,500,000 of new funding during the interim period, and additional funding upon entry of the final order approving the motion to approve entry into the DIP Facility (the "**DIP Motion**"), so that the Debtors can operate their businesses and commence a sale process and seek to confirm a plan. The DIP Facility is being provided by (i) Grizzly Investment Group, LLC, an entity formed by Rod Trujillo, a member of certain of the Debtors' boards and an insider of the Debtors, and (ii) Golazo NV, a Belgian naamloze vennotschap (collectively, the "**DIP Lenders**").

62. To secure all obligations of the Debtors under the DIP Facility, subject to Court approval, the DIP Lenders will be granted (a) an allowed superpriority administrative expense claim in the Chapter 11 Cases and (b) continuing, valid, binding, enforceable, non-avoidable, and properly perfected first-priority security interests in and liens on the applicable Collateral.

63. I am familiar with the terms and conditions of the DIP Facility, including, without limitation, the provisions for payment of interest and certain other fees, and the affirmative and negative covenants to which the Debtors would be subject under the applicable credit agreement. I believe these provisions are reasonable and that the Debtors will be able to comply with those terms and conditions.

64. Under the circumstances, I believe that providing the proposed DIP Lenders with a superpriority administrative expense claim and security interests is appropriate because the DIP

Facility was the only available financing as creditor pressure mounted and the Debtors required the protection in chapter 11 to preserve their value and administer their estates. Because the DIP Facility was the only available financing under the circumstances, the Debtors intend to continue searching for a higher or better replacement facility.

65. In connection with the DIP Facility and under my oversight, Force Ten has worked with the Debtors to prepare a budget for operating and other administrative expenditures during the coming months of these Chapter 11 Cases (the "**DIP Budget**"). I am familiar with the DIP Budget and its contents and believe it is fair, reasonable, and appropriate under the circumstances.

66. I believe that the DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lenders and their respective counsel and advisors. The DIP Facility was negotiated on behalf of the Debtors by me, as CRO, together with the Debtors' counsel and advisors. Without access to additional funding and the continued use of cash collateral as contemplated under the DIP Facility, the Debtors would suffer immediate and irreparable harm and would be forced to pursue a liquidation.

## CHAPTER 11 STRATEGY

67. Through the Chapter 11 Cases, the Debtors intend to pursue a comprehensive marketing and sale process to achieve the highest and best value for their estates and creditors. The Debtors have engaged Hilco Corporate Services, LLC to lead their sale efforts and seek to generate proceeds sufficient to fund meaningful recoveries for creditors. If the Debtors realize meaningful value from asset-sale proceeds and litigation recoveries, the Debtors intend to propose and confirm a chapter 11 plan that provides meaningful recoveries for creditors.

68. Additionally, the Debtors are seeking relief through the First Day Motions to avoid immediate and irreparable harm, minimize disruptions and adverse effects arising from the

commencement of the Chapter 11 Cases, and preserve value for their estates and stakeholders. The First Day Motions include:

a. *Debtors' Application for Entry of an Order Appointing Stretto, Inc. as Claims and Noticing Agent;*

b. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Employee Benefits Obligations and Other Compensation, (B) Continuation of Employee Benefits Programs and Payment of Related Administrative Obligations; and (II) Granting Related Relief*;

c. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I)(A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions; and (II) Granting Related Relief*;

d. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and (B) Pay and Honor All Obligations with Respect Thereto; (II) Authorizing Continuation of Insurance Premium Financing Arrangements; and (III) Granting Related Relief*;

e. *Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Debtors to Redact Certain Personal Identification Information for Individuals, and (II) Granting Related Relief*;

f. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Sales, Use and Other Taxes and Fees; and (II) Granting Related Relief*; and

g. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, (V) Granting Adequate Protection, and (VI) Granting Related Relief.*

69. The First Day Motions request authority to, among other things, enter into the DIP Facility, honor workforce-related compensation and benefits obligations, pay claims of certain insurers and taxing authorities, and continue the Debtors' cash management system and other operations in the ordinary course of business to minimize disruption during the transition into



12158136.1

chapter 11. The Debtors request authority, but not direction, to incur indebtedness and pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

70. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and the facts set forth in the First Day Motions are incorporated herein by reference. To the best of my knowledge, the facts set forth in the First Day Motions are true and correct, and if called upon to testify, I could and would testify competently to such facts.

71. As described in the First Day Motions, I believe that the Debtors' requests for interim relief are narrowly tailored to avoid immediate and irreparable harm and, in certain instances, seek authority to make payments that would otherwise be entitled to priority over general unsecured claims under the Bankruptcy Code. In my opinion, the relief sought in the First Day Motions is essential to avoid immediate and irreparable harm, allow the Debtors to operate without disruption, and preserve the value of their estates, and is in the best interests of the Debtors' estates, creditors, and other stakeholders.

72. For the reasons set forth herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in the First Day Motions and such other relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 4, 2026

*/s/ Nicholas Rubin*
Nicholas Rubin
Chief Restructuring Officer of the Debtors